John H. FLAIR, Sr., et al.,
Plaintiffs,

v.

Tommy COX et al.,
Defendants.

Civ. A. No. 75–020.

United States District Court,
M. D. Tennessee,
Nashville Division.

Oct. 22, 1975.

Lionel R. Barrett, Jr., Nashville, Tenn., for plaintiffs.

Peter H. Curry, Nashville, Tenn., for defendants.

DANIEL HOLCOMBE THOMAS, District Judge.

The above-styled case was heard by the Court without a jury and taken under submission on the 16th day of September 1975. Having considered the testimony, stipulations and arguments of counsel, the Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1. This action was brought by the plaintiffs, John Flair, Sr., John Flair, Jr., and William Flair, Sr., under 42 U. S.C. § 1983. The plaintiffs, citizens and residents of Tennessee, seek to recover damages against the defendants, Tommy Cox and Phales Finchum, police officers of the Metropolitan Government of Nashville and Davidson County, Tennessee. The plaintiffs allege that the defendants violated the plaintiffs' constitutionally protected rights from false arrest, false imprisonment and to be free from assault and battery. The defendants assert in defense, that they acted in good faith in arresting the plaintiffs and that no unnecessary force was employed to effect the arrest. The defendants further assert, that at the time the plaintiffs were arrested, they were carrying out their duties as police officers in a proper manner and they did not violate the plaintiffs' civil rights in any manner whatsoever.

2. It is uncontested by either party that the incident occurred on the afternoon of March 31, 1974, at the residence of John Flair, Sr., which is located at 675 James Avenue, Nashville, Tennessee. On that afternoon the plaintiff, John Flair, Jr., his brother, Donald Flair, his mother, Mrs. John Flair, Sr., and the children of John Flair, Jr., were in the back yard of the home of John Flair, Sr. Also in the back yard at that time was William Flair, Jr., the infant grandson [1] of John Flair, Sr. The heart of this litigation centers around this child and what events occurred after the grandson ventured from the back yard toward James Avenue.

3. While playing in the back yard the child apparently wandered and made his way to the front of the Flair residence. There is conflicting testimony as to whether or not the infant child was actually seen in the road or was near the road. The plaintiffs assert that the defendant police officers saw the child "in or near the road upon which they were traveling and stopped to make some type of an investigation." However, the plaintiffs all admit that they did not see the child leave the back yard. Moreover, plaintiffs testified that they did not see the child approach or enter James Avenue.[2] The defendants assert that they were on routine patrol in the area and upon turning the curve in James Avenue found the infant child crawling in the center of the road in the path of their oncoming vehicle. Further, defendants assert that Officer Cox, the driver of the vehicle, had to swerve off to the side of the road in order to avoid hitting the child.

4. Immediately thereafter, the defendant police officers departed their vehicle in order to conduct an investigation as to why the child was in or near the road by himself. At the time the officers were beginning their inquiry as to why the child was unattended, Donald Flair, son of John Flair, Sr., picked up the child and started toward the Flair house.[3] Subsequently, the defendants approached the residence and were met

---

1. Throughout the trial, the defendants referred to William Flair, Jr. as the "infant grandson" of the plaintiff, John Flair, Sr. On the other hand, the plaintiffs used the term "child." Suffice it to say, that according to the testimony given by William Flair, Sr., the father of the child, William Flair, Jr. was approximately two years and four months of age in March of 1974.

2. The Flair home is located in the residential area of Nashville. The speed limit in this area is posted at thirty miles per hour.

3. The defendants testified that Donald Flair picked up the child and disappeared around the rear of the Flair residence; however, the plaintiffs assert that the officers questioned Donald about the child prior to questioning John Flair, Jr. and John Flair, Sr.

by John Flair, Jr. The defendants began questioning John Flair, Jr. seeking to determine who the child's parents were and how they could be located. There is conflicting testimony as to the exact words that were exchanged between the parties. Suffice it to state that the officers were advised by John Flair, Jr., that he was not the father of the child. Upon further questioning, John Flair, Jr., indicated to the officers that they should speak to his father, John Flair, Sr. since they were on his father's property.

5. In pursuing their investigation, the defendants questioned John Flair, Sr. in an attempt to determine who was responsible for the child. Plaintiffs contend that the defendant Cox made statements to the effect that someone was neglecting the child and furthermore indicated that he was going to call the Youth Guidance Division, commonly referred to as juvenile, to have the child at least temporarily taken away from this residence. In defense, the officers testified that they simply questioned John Flair, Sr. pertaining to the wellbeing of the child and they were advised by the plaintiff that the child's mother was legally responsible for the child and no one knew her whereabouts. The plaintiff further stated that his son, William Flair, Sr., the father of the child, was divorced and custody for the child had been awarded to the mother. Unable to determine who would care for the child, defendant Cox testified that he then told John Flair, Sr. that he would have to contact Youth Guidance and inform them that the child was being neglected. According to the defendants, John Flair, Sr. became enraged and ordered the officers from his property.[4] The only person to offer testimony who was not a party to this action, or a member of the plaintiffs' family, was Joseph Worley, a neighbor who resides on James Avenue diagonally across the road from the Flair home.

According to Worley's testimony, on the day of the incident in question he was seated on his porch and he could hear loud voices coming from the Flair residence at the time the defendants were questioning the plaintiffs. Moreover, Worley testified that the voice of John Flair, Sr. could be heard although the witness admitted that he could not make out the words being exchanged between the parties.

6. At this point in their investigation, the defendants returned to their police car and following normal police practice contacted Sergeant Weaver, their zone supervisor. In addition, the defendant Cox contacted Youth Guidance requesting that they forward a unit to the plaintiff's residence. Shortly thereafter, the defendants stated that they returned to the plaintiffs' porch and resumed their questioning of the plaintiffs. Whereupon, according to the defendants, John Flair, Sr. threatened to have the officers' badges and once again ordered the defendants off his property. The officers, not able to ascertain the location of the child's parents or who was caring for the child, placed the plaintiff under arrest for disorderly conduct and interfering with a police officer. Defendants admit that in attempting to place John Flair, Sr. under arrest, Officer Cox put his hand on the arm of the plaintiff, whereupon John Flair, Jr. informed Officer Cox to remove his hand from his father. Defendants' assert that John Flair, Jr. approached the defendant Cox and grabbed Cox by the arm in an attempt to have the defendant release his father. Seeing this, Officer Finchum placed the plaintiff, John Flair, Jr. under arrest for disorderly conduct and interfering with a police officer. Contra to what the defendants have asserted, the plaintiffs testified that Officer Cox in questioning John Flair, Sr. grabbed the plaintiff by the left arm and pushed the arm upwards in a "pushing and pulling fashion" so as to

---

4. The parties are in disagreement as to what exchanges were made. The officers testified that the plaintiff, John Flair, Sr., used profanity and ordered the defendants to leave his property since they did not have a warrant. The plaintiffs assert that profanity was not used by the plaintiff.

cause pain to the plaintiff. Plaintiffs further testified that they offered no resistance to arrest.

7. Immediately thereafter, John Flair, Sr. and John Flair, Jr. were taken to the patrol car and as they were being placed into the vehicle, William Flair, Sr., the father of the child, arrived on the scene. In questioning William Flair, Sr. he admitted that he was the child's father. At this point, officer Cox placed the plaintiff-father under arrest for child neglect, whereupon all three plaintiffs were handcuffed, placed into a patrol car and taken down to the police station where they were booked and jailed.[5]

8. Appearing before a Committing Magistrate, the officers explained the facts surrounding the plaintiffs' arrest. The Magistrate then approved the issuance of the warrants that were requested.[6] At a later trial in the Court of Metropolitan Nashville-Davidson County, all charges were dismissed against the plaintiffs. The evidence further indicated that each of the plaintiffs were required to post bond in the amount of $50.00, which was not refunded. In addition, the plaintiffs John Flair, Jr. and William Flair, Sr. lost pay from missing work due to the fact that they were placed under arrest.

9. In summation, the central question in this case is whether the defend- ant police officers, under all the circumstances presented in this action, violated the constitutionally protected rights of the plaintiffs. Based upon the evidence presented at trial, the Court finds that the defendants, though perhaps not exercising the best judgment, acted in good faith. Furthermore, the Court finds that the defendants were performing their duties in a proper manner. Accordingly, and for the reasons set forth hereinafter, the Court finds that the defendants did not violate the plaintiffs' constitutionally protected rights.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of this action pursuant to 42 U.S.C. § 1983[7] and 28 U.S.C. § 1343.[8]

2. The plaintiffs herein assert that the defendants at all pertinent times, acting "under the color of state law," violated the federally-protected civil rights of the plaintiffs. There can be no dispute that an action for damages can be maintained under 42 U.S.C. § 1983 for the unlawful and false arrest of an individual. *Ford v. Wells,* 347 F. Supp. 1026 (E.D.Tenn.1972). Moreover, specific intent to injure is not a prerequisite to recovery for police abuse under Section 1983. *Monroe v. Pape,* 365 U.S. 167, 187, 81 S.Ct. 473, 484, 5 L.Ed.2d 492, 505 (1961); *Whirl v. Kern,* 407 F. 2d 781, 787 (5th Cir. 1969). According-

---

5. There is conflict in the testimony as to the degree of force employed by the defendants in placing the plaintiffs, especially John Flair, Sr. into the patrol car. Based upon the evidence as presented at trial, the Court finds that the degree of force used by the defendants was reasonable, proper and necessary under the circumstances.

6. A petition was filed by Youth Guidance officers, following an investigation of the case, placing the child in the custody of the Juvenile Court.

7. "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. § 1983.

8. 28 U.S.C. § 1343. Civil rights and elective franchise. "The district court shall have original jurisdiction of any civil action authorized by law to be commenced by any person: . . . (3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, or any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States; (4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote."

ly, damage suits that are brought pursuant to these statutes are framed against the background of tort liability that makes an individual responsible for the natural consequences of his actions, be they wilful or grossly negligent. *Monroe v. Pape,* supra.

■ 3. The gravamen of the police officers defense in this action is that they acted in "good faith" in arresting the plaintiffs and that they employed no unnecessary force to effect the arrest. Without a lengthy discussion of the precedents, suffice it to state that it is well established that the good faith defense is available to the defendant police officers when they are being sued for false arrest under 42 U.S.C. § 1983. *Pierson v. Ray,* 386 U.S. 547, 557, 87 S. Ct. 1213, 18 L.Ed.2d 288 (1967); *Pritchard v. Perry,* 508 F.2d 423, 426 (4th Cir. 1975); *Hill v. Rowland,* 474 F.2d 1374, 1377 (4th Cir. 1972); *Banish v. Locks,* 414 F.2d 638, 641 (9th Cir. 1969); *Notaras v. Ramon,* 383 F.2d 403, 404 (9th Cir. 1967); *Edwards v. Duncan,* 355 F.2d 993, 994 (4th Cir. 1966). However, in asserting the defense of good faith it is necessary that the defendants establish that they acted in good faith and with a reasonable belief as to the validity of their actions. *Pritchard v. Perry,* supra; *Cohen v. Norris,* 300 F.2d 24, 32 (9th Cir. 1962).

■ 4. As to the good faith defense asserted by the defendants in the instant case, the Court finds from the evidence presented at trial that the defendants acted in good faith in conducting their investigation with regard to the unattended child that was found in James Avenue. The Court further finds that the plaintiffs John Flair, Sr. and John Flair, Jr. interfered with the defendants' investigation and under the circumstances, this interference resulted in their arrest. Accordingly, the Court finds that the evidence supports the proposition that the officers acted in a reasonable manner and their conduct was lawful.[9]

■ 5. Regarding the plaintiffs' allegation of assault and battery, the Court is of the opinion that the defendants did not use unreasonable or unnecessary force in escorting the plaintiffs to the patrol car.[10]

■ 6. With regard to the arrest of William Flair, Sr. for child neglect, the central issue to be considered is whether Officer Cox, at the time of arrest and under the circumstances as they existed on the day in question, could reasonably believe that the plaintiff-father was guilty of child neglect. Based upon the evidence as presented at trial, the Court finds that the defendant had probable cause to make the arrest.[11]

7. It is unfortunate that this incident occurred and perhaps by the use of sounder judgment on the part of all, could have been avoided. It has been blown up out of proportion and does not justify a judgment being entered for the plaintiffs against the defendants.

A decree will be entered in accordance herewith.

---

9. Tennessee Code Annotated § 40–803 provides: "An Officer may, without a warrant, arrest a person: (1) For a public offense committed . . . in his presence."

10. Tennessee Code Annotated § 40–808 provides: "If, after notice of the intention to arrest the defendant, he either flee or resist, the officer may use all the necessary means to effect the arrest."

11. Considerable discretion is afforded to a police officer in making an arrest who often times must make an on-the-spot evaluation as to whether an individual should be taken into custody. *Restatement of Torts,* Second, states: "The additional privilege is given because the peace officer has an absolute duty to the public to prevent crime and arrest criminals; the performance of these duties would be seriously impaired unless police officers were given considerable discretion in their performance and protected from liability for the consequences of honest and reasonable mistakes." Section 121. Comment (b) and (c) at 206; *Whirl v. Kern,* 407 F. 2d 781, 790–791 (5th Cir. 1969).